Good morning. Yes, sir. May it please the court. Good morning, Your Honors. Tom Monahan on behalf of Mr. Haskell. Your Honors, the District Court erred in this case by holding that the inquiry of the police officers was related to the mission of this encounter. Um, under Rodriguez v. United States, the Supreme Court drew a line in the sand. If the police measurably prolong a traffic stop or detention beyond the time reasonably required to complete it, they violate the Fourth Amendment. And that's what happened here. Well, the trouble with a line in the sand and the same using the word measurably, they're incompatible because measurably implies that there's room to consider what was appropriate and what wasn't. Um, the length of time here amounted to what? Four seconds. Right, four seconds. And are you telling us that that would be impermissible under Rodriguez? I am. And here's why. Your Honor, I think we have to remember that the per se status is that any interference, uh, seizure of any kind by law enforcement is barred by the Fourth Amendment unless there's an exception to the warrant requirement. So we don't start from a premise. And the Court could have said, we'll look at the overall context and decide if the delay was reasonable in the whole context of the stop. And this Court said, interpreting in Landeros, United States v. Landeros, that that was squarely rejected by the Court in Rodriguez. In fact, that's exactly what I think Justice Thomas said. Justice Corwin ultimately held was, as I understood it, not that the four seconds didn't matter if they were actually done with the project, but that they weren't done with the project because this particular project or this particular situation was not a typical traffic stop. In fact, they hadn't stopped him for a traffic violation. Um, and instead there was an accident and they were investigating the accident. Um, and he, um, essentially they needed to make arrangements for this car cause he didn't have a driver's license. And this was part of making arrangements for the car that it wasn't extra. So what about that? Your Honor, uh, with respect, I think, um, the Court erred in this, in the sense by saying that essentially there was safety risks that went with, um, this accident investigation and leaving the car on school grounds. Well, there's safety concerns in any traffic stop. And yet those did not justify, and even Judge Windmill said, in the context of an ordinary traffic stop, there's no more danger. Well, in an ordinary traffic stop, when the traffic stop is over, the person's going to drive away. Therefore, there's no interest in what's in his car. Right? But here he's not going to drive away. That's the whole problem. He's going to leave the car at the school. But I, I guess I, I don't think that asking for consent to search, um, even though that's the case, uh, the person would have presumably, Mr. Haskell would have presumably gotten somebody to pick the car up and the police were going to leave. The police were driving away. Well, that's presumably, I mean, they don't have any, I mean, he might just leave it there till that morning. They, they, they had a reason why they weren't going to do what they might otherwise do, which is wait to see if somebody picked it up. Um, and so, I mean, it doesn't seem to me that Rodriguez translates very well to this situation. Well, I think it's certainly still a non-consensual encounter. Nobody disagreed that it was a seizure still, um, by virtue of the fact that had Mr. Haskell tried to leave, he would have been stopped by virtue of the state law requiring him not being allowed to leave the accident scene. But also, um, the police were leaving. They had decided there wasn't so much of a danger.  And, and for that reason, they wanted to at least figure out whether there wasn't another danger. I mean, the problem with car, guns in cars is not an ephemeral one. I mean, there have been an awful lot of stolen, guns stolen out of cars. That's very true. And that could be the case in every traffic stop. Then why don't we let the police ask for consent to search all the time in a traffic stop? Because the person's going to leave and he's not going to leave. That's the problem. I, I, I guess I'm not seeing how that changes the equation when the facts of the case were. We were, uh, they were on school grounds, but it was on a Friday on a snowy, uh, uh, 4.30 PM. There was no evidence that there were children around or any other passers-by. Um, I think the police did, but the police had no way of knowing how long that car was going to be left there. This guy couldn't come back and pick up the car because he didn't have a driver's license. So he had to get somebody else to pick up the car and it's snowing. You don't have any idea how long that car is going to be left parked in a school parking lot. And you don't think it was reasonable for the officer under those conditions, not that the guy didn't, you know, had a missing taillight or something, but that he's leaving his car in a school parking lot unattended for who knows how long. But they were the ones who told him to leave it there. And if it was that dangerous, why, why put that, why put it at that place? And that's what they're trying to find out. Was it dangerous? Well, I guess the burden I think is on the government to show and the district court made no findings that there was any actual danger. There was no evidence presented. And again, the facts before the court sort of belied the argument that there was safety concerns. 430 on a Friday with no evidence that children or anybody else was around and no indication. Nobody asked. They didn't say, hey, Mr. Haskell, how long is it going to take you to get somebody to come pick this up? Or if it was that dangerous, you know what, let's just get a tow truck and, you know, take it downtown to the impound lot. They could have done those things. They chose not to. And I think the fact that they didn't do those things belies their claim that they were terribly concerned for the safety of the community. And in that situation, the fact simply that there were no. To me, really, the part of this that's questionable, you haven't questioned. And that is the fact that they ran a felony check while they were waiting. I assume the reason you haven't checked it, you haven't questioned it is because because the Evans case essentially says you can't do that if that's taking any extra time. The problem is it doesn't seem to have taken any extra time because they were meanwhile dealing with the accident issues. Is that right? Because you don't challenge that. I think that's a fair point. And that is something that Evans did say prolonged the stop impermissibly. But again, I think, frankly, if safety was really a concern, looking at the person's background, which Evans says you can't do, would be more of a salient inquiry than asking or, you know, being worried about leaving it at the school grounds when there's no evidence that there's a danger in that situation. To me, you know, their understanding was that he was going to leave. The car was going to stay. The car was going to stay possibly unattended by Mr. Haskell with presumably the ability to lock it. There's no evidence that there's, you know, some sort of rash of children breaking into unattended cars in that parking lot or even generally speaking, whereas in Berlin versus Wilson, there were actual statistics about danger, real danger to police officers in the context of actual traffic stops. There are statistics cited by the Supreme Court and yet that we don't just allow things like, you know, in every traffic stop, hey, do you mind if I search your car? So I think of the facts of this case, it was just simply not related to the overall mission of making sure that the car was safely picked up. Can you remind me, where did things leave off in terms of the conversation between your client and the officers about how the car was going to be, you know, somebody was going to come and get it? I honestly, I don't remember if there was any real questioning about that by the officers. But the reason I'm asking is because it sounded like you were conceding when you were speaking with Judge Berzon that there was at least the prospect that the car would be left unattended for some amount of time. And is that a fair statement of what the record shows? I think that, I don't know if I'm conceding, I'm conceding the fact that we didn't know. That's true. I don't think there's clear evidence in the record when it was going to get picked up. Nobody told him that he had to stay there. Nobody, right? Not that I recall. That's right, Your Honor. But again, I would come back to the fact that, you know, if there was really this concern, rather than this being just sort of an ordinary, an attempt to detect ordinary evidence of criminal wrongdoing, the officers would have asked, you know, or again said, you know, we're worried about this situation. We don't want you to leave it on the school parking grounds. We're going to get a tow truck. In fact, you're under arrest, you know, for having a suspended driver's license. They could have done all of those things. They chose not to. And then I think the fact that they didn't do that. I have no idea whether you can arrest somebody for having a suspended driver's license. The government in its brief in the district court, in its response to our motion cited law, that that is in fact permissible under Idaho state law. But they chose not to. But then they would have left with the same problem with the car. Again, again, a tow truck could have impounded it. All right, fine. They could have done a lot of things. But the question is whether what they did do, leaving aside the four seconds was not within a, the, the, you know, a cognizable response to the situation. I, I guess I would just say again, under these particular facts, without any specific evidence from the government, whose burden it was to justify this warrantless search, without those things, under these circumstances, it was unreasonable for them to ask that question and to get, or ask for consent versus the ordinary traffic stop where that is not found to be reasonable. All right. You're, well, I don't know if you, if you want to save any time or you want to use your 17 seconds. No, I'll, I'll, I'll save it. Thank you very much, Your Honor. Appreciate it. Morning, Your Honors. May it please the court. My name is Christian Asker and I represent the United States. The district court did not clearly err in finding that the officer's question was reasonably related to their mission on that day. And I agree that Rodriguez is not a good fit. I think the framework is helpful. But at the end of the day, this is much different than the trap, routine traffic stop in Rodriguez or in Evans for that matter. The officer's mission went beyond simply issuing a citation and having the defendant go on his way. I mean, just because I'm curious, is the rule that you have to stay by an accident, a seizure? I mean, you have to stay there whether the police come or not, right? I mean, the requirement is, as I understand it, is ordinarily a governmental requirement, a sort of a condition of driving that if you get in an accident, you have to stay there, deal with the person, give them your, your insurance and so on. And if, whether or not the police come, right? True. You have to exchange insurance. So the requirements that pertain to your, the, the traffic accident really are not because the police are going to come, are asserting authority. It's because there's that sort of civil duty to do this. That's correct. So I don't know if there's a seizure at all, but. At some point, the officer decides he's going to issue citations. And clearly the defendant is not free to leave as the officer's writing up citations for following too closely and, and, and whatnot. But. No, that's true. Why isn't it at that point turned into something parallel to Rodriguez? Because at that point, unlike Rodriguez, the encounter doesn't end upon the issuance of citations. The officers in this case had to clear the accident scene. And at the very least, they had to remove the car from the middle of the access road. And so there were additional objectives of the mission that had yet to occur. And at the time the officer asked the four seconds of questions. Um, he had several duties that remained. He required, he had to prevent the defendant from driving away and he had to ensure that the vehicle was moved out of the roadway. Can I ask you this? Cause I just pretend that these are the facts of our case. Um, let's say that the dialogue between the officers and, uh, and Mr. Haskell, um, is such that, uh, he says, I've already called my wife. She's five minutes away and she's going to come and, and, uh, and come and pick me up. Okay. Okay. Um, in that scenario, uh, does the officer, I mean, is it now still within the mission as you're imagining it to, for the officer to say, oh, okay, well in the five minutes it's going to take for her to get here, uh, anything I should be worried about in your car? I think in some regards, that's, that's a better case for the government. Um, because the mission is not going to end until that third party arrives to pick up the car. Uh, the officer has no obligation at that point to drive away and take Mr. Haskell's word for it, that someone's on his way because he has to ensure that that is in fact true, that a third party is going to come. And so he can wait those remaining five minutes until the third party, he can check that third party to see, are they validly licensed and then they can clear and say, go on your way. And that's sort of like the 11th circuit case that the district court cited too, with Vargas. There was 15 to 20 minutes where the officer was waiting around for trying to find someone to pick up the vehicle. And during that 15 to 20 minutes after he had already given a warning for a traffic citation, he asked for consent to search the car. And the 11th circuit found the mission was ongoing. Yeah, no, actually it didn't. That was the problem I had with the 11th circuit's reasoning. The 11th circuit just said, well, the detention at that point hadn't ended. And because he was still being lawfully detained, it was okay to ask for consent. And that's not the correct analysis under Rodriguez. You have to do the analysis that you're asking us to do, which is what's the scope of the mission? And the 11th circuit never did that. That's why I'm trying to change the facts a little bit. I frankly don't agree with you that my hypothetical was better for the government. I think it's actually far worse. The only thing that's good for you here, I think, is that there's, there wasn't a clarity as to how long the car might have to sit there on school grounds when, in theory at least, some innocent person from the public could break into it and get their hands on a dangerous object. Well, I'm glad the facts are better in this case. Well, I mean, actually I'm not, I actually, I find this to be a somewhat troubling case because I don't, that's why I was asking your, your opponent here, where things stood at the time the question was asked. Cause I guess I thought I, I thought the record indicated that Mr. Haskell had said, I'm going to get somebody to come here. I'm not going to just leave this car unattended. And in that set of facts, I just, what is the officer's interest in knowing whether you have something dangerous in your car? The officer is not going to have any further interaction with the car. And if the car is not going to be left unattended, where in theory, some, some mischief could occur. Why does the officer care? But I think the officer, I think first you have to look at the question. The officer asked, he didn't ask, do you have a gun? Do you have drugs? Do you have contraband? Do you have anything dangerous? He said, is there anything in the car I need to be concerned about? That does make it more questionable, actually, not less, doesn't it? I mean, it's one thing to worry about a gun. It's another thing to worry about some, some methamphetamine somewhere. Well, but what he asked was, is there anything in the car I need to be concerned about, and the context of that question was they were getting ready to move that car, it had been decided, I believe the defendant had asked if he could move and park the car, and they're going to leave it for an indeterminate amount of time. I believe that in the record, the defendant stated that he was hopeful that he could call someone and, and have, have them pick him up, but by, there was never any mention of someone's on their way. So no one had any idea whether this was going to be left in the school parking lot for five minutes or for three days. And so when he asked, is there anything in the car I need to be concerned about? The officer knew that this car didn't belong to him. This was another person's car. Are there valuables in the car that cannot be secured? Do the locks of the car work? Is there a pet in a pet carrier in the back seat? Is there anything in the car I need to be concerned about? Because we're leaving this car unattended in a school parking lot. And what was the next question? When he asked him for consent, what did he say? Do you mind if I look? And at that point, I think the district court does a good job of pointing out if he says, yeah, I mind if you look, then the officer has the option. He can say, well, maybe this isn't such a great idea to leave this car unattended in a school parking lot for an indeterminable amount of time. And at that point, as was discussed in the earlier argument, the officers could have done several different things. They could have placed him under arrest. For driving without privileges and impounded the car. They could have said, you know what, if you don't want us to search this car, I'm going to call a tow truck and we're going to wait until the car gets towed. And so. I think when you look at this objectively, you know, to the extent that Rodriguez applies, it's trying to avoid questions that really have nothing to do with the investigation into unrelated criminal matters. And I know you don't look at the subject of intent to the officers, but if this officer was really trying to conduct a separate investigation, he would have arrested the defendant, knowing that the car would have been impounded and inventoried. So I think that there's, there are indications that aren't there in this record that the officer actually was quite suspicious of Mr. Haskell and did have an interest in finding out what might be in that car. Yes. I mean, actually the government argued that there was reasonable suspicion. That's what I was trying to remember. Right. So I don't think it's helpful to even get into that for you. I think it's clear this was, you know, he wanted some basis for searching the guy's car and this is the one he landed on and maybe it's okay under Rodriguez. I don't know, but. But I think we have to look at it objectively with what he did and in the district court, I believe was correct when it found that this was a, a and benefited the officer, really the general public that allowed him to get back out to deal with other accidents. Well, it's hard to see it benefited Mr. Haskell since he ended up getting arrested. Well, he, he wouldn't have had his tow card and impounded. Well, but what, um, I asked your opponent this, but I don't understand what, why the felony search was part of the whole arrangement. Well, that, that was, A, never raised, but on excerpts of record page 53. Cause that probably is what gave rise to this question, really? Well, on excerpts of record 53, uh, officer Hodnett testified that he didn't do a felon check, an ex felon check. He didn't run the defendant's criminal history. He was there addressing the citations and investigating the accident. Well, somebody did. The second officer, officer Hemmert, who was there, um, I believe on page 53, uh, Hodnett testified that Hemmert advised him that Mr. Haskell had a felony conviction. And he assumed that Mr., or officer Hemmert had run that while he was doing the citations. And that's perfectly fine under Rodriguez. Rodriguez doesn't prevent unrelated, non-reasonable suspicion searches, dog sniffs, as long as it doesn't add time. And so there was no evidence in the record that the ex felon check or the criminal history run added any time because, um... Can I ask one last question and then you're out of time, which is, um, are you relying in any regard on the fact that it was only four seconds? Your Honor mentioned something about measurably. And measurably means significant or to be measured. It means you can measure it. And so the short answer is no, Your Honor. Um, no. All right. Thank you very much. And we'll give you one minute to rebuttal. I want to thank my opponent for reminding the court about, there was some, as I recall, I didn't want to misstate the record. I think there was some mention by Mr. Haskell that somebody could come and get the car. But I think the failure to ask or wait by the police shows that the safety concern wasn't the paramount issue. I'm sorry? Do you know where in the record that? I don't off the top of my head. I apologize to the court. Um, but I will say that the fact that they didn't ask the questions like, is there this pet in the backseat or are these other, you know, things in the car? Um, they'd go right into, do you mind if I take a look? Um, and I think the failure to ask those questions shows that this was one of Ginsburg's concerns. This was aimed at detecting ordinary evidence of criminal wrongdoing. Um, and I think that, um, the fact that, uh, and I'd also just mentioned for the record, there was no evidence that the impound, if they had gotten the tow truck and impounded, that the policy for the impound by this city would have permitted an inventory search under these circumstances. That's all I have. Thank you so much. Thank you very much. Thank you both for your arguments. Um, United States versus Haskell is submitted.
judges: Berzon, Watford, Rothstein